Case numbers 251056, 251099, 251104, 251157, and 251353. Raef Hamaed et al., I'm sorry, USA v. Raef Hamaed et al., for arguments not to exceed 40 minutes per side and shared by the defendants. Mr. Goetz, you may proceed with the impeachment. May it please the court, Andrew Goetz for defendant Raef Hamaed. With the court's permission, I would like to reserve two minutes of my time for rebuttal. The central problem in this case is that the government buttressed its evidence using a forensic analysis prepared by a last-minute substitute expert, while the district court's rulings prevented the defense from challenging that evidence in ways that matter. The district court's rulings, all of which concern the same central trial issue, were constitutionally improper, and this case should be remanded for a new trial. I want to start with the confrontation clause issue, because this case mirrors what happened in the Supreme Court's decision in Smith v. Arizona, where the government used a last-minute substitute expert to convey the substance of absent analyst conclusions to the jury when those analysts were not called to testify. Before you jump to the merits, can you sort of how this issue is preserved? I know there was various objections, but it's hard for me to see any objection that was really geared towards a confrontation clause-type challenge, until after the trial. I have two. So, three ways, Your Honor. First is at the time of the objections to Joanna Sullivan's testimony. The substance of those objections mirror what we are saying here. Now, I will concede that nobody said the word Sixth Amendment or confrontation clause, but the substance of those objections dealt with the fact that Sullivan did not have personal knowledge of what she was testifying about and was conveying that information to the jury. But let's say the court finds that that's not sufficient. That sounds like hearsay, lack of personal knowledge and hearsay. It's a little bit different from the hearsay cases in that you make a specific hearsay objection. It was much broader. Personal knowledge is a common evidentiary objection. So, lack of personal knowledge. I mean, that's not typically considered the same thing as confrontation clause. It's not typically, but they went a little bit further here, and I think they went far enough. But let's say you disagree with me. Let's say you disagree with me about that. There was a motion for reconsideration filed by Defendant Abdel Razak. A few days later, he filed that. He expressly mentioned confrontation clause and referred back to the previous ruling. That's why it's a motion for reconsideration. And he filed that before the government rested when there still would have been time to address this issue, either strike the testimony or require the government to call the witnesses. Is there a case, because usually later objections once the witness is done or once the witness is testified aren't sufficient to preserve, I mean, do you have a case that says that's sufficient? So, not in these circumstances where you have an initial objection that is maybe more wishy-washy than it should have been, but you have a follow-up motion for reconsideration that raises this precise point. I think usually what the case law looks at, Judge Tapar, is can the district judge redress the issue based on the timing of the objection? What would be the redress there? Because if there's a confrontation clause violation, I guess it would be you have to call all these witnesses at this point, would be the answer? So, that's correct. There'd be two ways to do it. One would be to strike the parts of Joanna Sullivan's testimony that violate the confrontation clause. The other way would be to call witnesses. That's why I think it's important that the motion was filed before the government rested, because there'd still be time to do those things. I mean, if this had all happened after trial, I think we'd be in a much tougher spot. But the fact that this happened before the government rested, I think is a very key point here. Under the confrontation clause, if we were to get to that on the merits, would the government have to call every single person in Clarence who touched the data in order to not violate the confrontation clause? No, Your Honor. And the Supreme Court addressed this point in some of the back and forth in Melinda's and in Smith's. They would have to call the people whose conclusions they are relaying to the jury. So, the government makes that call. What conclusions do we need to relay to the jury to make our case? Those are the witnesses against the defendant. Those are the people they have to call. They can't relay those people's conclusions through a different witness. So, who here, who specifically would have to be called? Because the concern is that if you have a large entity with many people doing the mechanics, the computational mechanics, the other kinds of things, that there would have to be a dozen witnesses because of a dozen different people touching the data. Or who exactly would have to be called here to meet your confrontation clause argument? So, I'll answer the first part of your question dealing with this case and then address your broader policy question. So, in this case, I think there'd be three different people. One is whoever looked at the wholesaler records and went back and forth with law enforcement to conclude that those records were accurate and complete. I think that's the most important witness we would have liked to cross-examine here just because that's where the defense was really focused on the inadequacy of the records, the age of the case, the fact that some wholesalers appear to have been missed, the fact that record retention policies don't typically go back a decade. So, that witness, the one who relayed to Joanna Sullivan what he or she did with the wholesaler records, that witness would be the most important. There would also be the same type of witness who reviewed the claims data, the other side of Clarence's analysis here because, you know, the same problems can occur in that data and those representations matter too. I'd say the third person would be whoever reviewed the output of the report or anomalies. What about the fact that she was supervising all of this? So, that helps a little bit, judge Lepar, but it doesn't get the government all the way there. It means that she was involved in certain parts of the analysis and had personal knowledge and the ability to testify about parts of the analysis, but it doesn't allow, it still doesn't allow her to testify about what other people did. And I don't think the Supreme Court's ever gone that far and said, well, just because somebody's a supervisor in the lab, they can still testify and incorporate in testimonial hearsay. Well, I mean, a lab's a little different, but maybe you're right, but in Volkoming, Justice Sotomayor clearly talks about that in her concurrence. So, Justice Sotomayor doesn't go that far in her concurrence. What she says is you don't have to call anybody who ever touched the evidence, and I think what she's talking about with supervisors is a supervisor that's involved in the process with the person who they're, who's, I guess, they're observing in that process. So, it kind of gets to what the word we, what might mean in this context. If you have two people doing something together, I think one can testify about what the other person was doing, but if you have two people doing something separately, you can't, still can't have a supervisor testify about what that other person told him or her. Getting back to your question, though, Judge Moore, on the policy issue, you know, the Supreme Court addressed this in its decisions as well, and their point, I think, was threefold. One, the Confrontation Clause doesn't give away to expediency, but two, in most cases, this type of issue isn't going to be contested. You have notice and demand statutes for chain of custody. You have the fact that, strategically, it doesn't make sense for the defendants to focus on weak parts of their case and to fight over things that are not contested, so it just doesn't come up that much. And then you have sort of the, you see, the broader point that you don't craft a rule that swallows the exceptions when those exceptions might be very important. So, going back to your hypothetical, Judge Moore, if, in most cases, 99% of cases, chain of custody doesn't matter, and the parties stipulate to it, or they don't address it at all, either because of notice and demand statutes or because it's just not an issue. In that 1% of cases, it's very important, and so you don't craft a rule that allows the government to skip those cases and use testimonial hearsay from out-of-court witnesses in those cases where it matters. But in the area of medical fraud, which seems to be a very prevalent concern these days, the result of saying that there is a confrontation cause violation here could well be that you have to have, as you pointed out, at least three different people, the person who did the person who's doing the quality control. You'd have to have all three of those people, and that assumes that there's only one person at each of those levels as opposed to a group of people doing it. Your answer would be yes, that's what the Constitution requires, I assume. Yes, and I think that's a feature, not a bug, particularly in a case like this, where that's one of the main contested issues here. I mean, this was a focus of the defense. So, I think, you know. So, that gets to the question, even if there is a confrontation cause violation here, is it harmless error given the weight of the other pieces of evidence that came in? So, the answer to that is no, Judge Moore, and I think it's no for the central reason that this was the objective evidence against the defendants. This is what they used to tie all the other evidence together. Most of the government's other evidence came from cooperating witnesses, either directly out of their mouths about what they observed or their spin on other pieces of, excuse me, other pieces of evidence that had, I'd say, alternative explanations that were very plausible. And so, the government relied very heavily on cooperating witnesses. This was the objective evidence that it used to glue all of that together, and so that's why the defense went at it so hard. I think they knew what the cooperating witnesses were going to say or they didn't think it was correct, and they were trying to go after the objective evidence and undermine the government's case from that perspective. And so, you know, cooperating witnesses have a lot of baggage. It's not typically baggage the court considers in a sufficiency case, but here we're not arguing sufficiency. We're arguing harmless error, and so the court looks at the whole of the trial record and determines what the effect of the error would be. So, I think that's our best argument for harmless error here, and I think it's a pretty strong one, given how much the government relied on that data to show its case. I would say, going back to the mayor's, how was the sort of the testimony that you're pointing to as hearsay, how was that testimonial? So, I think it's testimonial because it was going back to what the Supreme Court said in Melendez-Diaz using that definition. The Supreme Court's been all over the place on definitions, but the Melendez-Diaz one's the natural one to hear, because those statements were created under circumstances that would lead an objective witness to believe that they would be available for use later at trial. So, I'm butchering that slightly, but that's the general standard for testimonial in this context, and if you have other analysts who are compiling this information, working with law enforcement in a pending investigation, and then conveying their conclusions to a supervisor, it's tough to see how that would not be testimonial. Anytime there's an allegation of Medicare fraud and it's investigated, is that always come under Melendez-Diaz? Because if there's Medicare fraud, right, presumably you're going to use it at some point in trial. So, I guess I'm struggling with your hypothetical, because I'm struggling with what context you're thinking of, Judge Tappar. Are you thinking about this context with the analysts? Yeah, where you have people go in, right, like you're pulling, when you're pulling the prescription records, those are clearly business records. Those aren't testimonial, right? I mean, you agree on that. The Supreme Court has said business records are not testimonial. I will agree on that. So, they're pulling all the stuff. I guess the part you would say is testimonial is the part after they pull. Is that fair, or am I thinking of it differently? They pull all the records, and then they make, I guess, some conclusions that she relies upon? That's correct, Judge Tappar. It's those conclusions upon review of the records and those statements to Joanna Sullivan or whoever they were conveyed to. So, it's not the records itself? That's correct. The records themselves, I mean, here, at least, they would qualify as business records. They would not be considered testimonial. What did she say? I've looked at her primary testimony. What did she say that you think is that is particularly harmful here? So, I would start at, I think, page 1985 of the record on the first day. If you look at the bottom of that page, she talks about what they did when it came to liaising with law enforcement and reviewing these records and the practices they had when it came to going back and forth with law enforcement and ensuring the accuracy and meandering through that testimony, and then clarified, and during Cross, at least, that she was not there for those things, and other people had done the verification. So, it's that combination of starting with page 1985 and then continuing with what she testified in Cross when it suddenly came out that, oh, she actually had not been involved in those parts of the analysis. I'd also refer the court to similar testimony during redirects. I think it's 2346-48 of the what the absent analyst did when it came to verifying these wholesaler records. I'm happy to answer any further questions on this issue. Otherwise, I'll turn to the legitimate prescriptions issue with the remaining part of my time. So, this is a billing fraud case, and there's nothing more relevant to disputing billing fraud allegations than presenting evidence that billed substances were actually provided. The district court's pretrial ruling here, which was incredibly broad, prevented the defendants from presenting any evidence of legitimate prescriptions or legitimate billings or the provision of legitimate services. That ruling did not contain the exceptions that the government now says it does. It is a sweeping ruling preventing any evidence on these points. Now, while preventing the defense from introducing that evidence, the government stood up in its opening, at the outset, and talked about how there were tens of thousands of illegitimate prescriptions. It did the same thing in closing, talking about tens of thousands of illegitimate prescriptions. But at the same time, it blocked the defense from showing that any prescriptions whatsoever were legitimate. The government can't do that. And to do that, the government commits the district court to apply what's an inapplicable rule that generally prevents some unrelated good acts from being used by the defendant to show good character. Well, this wasn't that. This was the core of the case where the defense is trying to rebut the government's case using the provision of legitimate services and is barred from the outset from doing so. So I'm curious whether the evidence, I'm not asking you to go beyond the record, but whether the evidence shows what percentage of alleged illegitimate prescriptions were of the total prescriptions. Was it half? So it depends on which witness you're talking about, which was part of the defense theory here. Joanna Sullivan testified it was half. The witnesses went back and forth. I think Hassan Abdullah said it was 125 out of 200. I think Krizat testified about the same. So it varied when it came to how many were illegitimate. Nobody said that all the prescriptions were illegitimate. But I guess the aim of my question was thinking, it's one thing if someone is being tried and convicted for one illegitimate prescription versus having 100,000 valid prescriptions. The innocent mistake idea is quite logical and believable. But if it's half are illegitimate, then just be able to show that, well, if there were 10,000 illegitimate but there are 10,000 valid ones, that may be less of a problem. So I have three responses to that. First is there are still ways you would present evidence in this case to rebut the government's theory. One would be present evidence of people getting the drugs, the types of drugs that the government said were at the core part of the case. That wouldn't entirely rebut the theory, but it would certainly go a long way, particularly if you added several of those witnesses right in a row. And indeed, that's what happened with the government's witnesses here, where the government presented witnesses on those points. And those the government's case. Second point would be auto refills. The government's theory rested heavily on auto refills. But you can still imagine the defense putting on witnesses who got auto refills. And again, that starts to undercut the government's theory here. And I'd say the third point would be building on those, even apart from those original drugs. Once you start putting enough witnesses in a row, that helps the defense rebut the government's allegations. Now, the government can always get up in closing and say, well, those were, of course, the legitimate ones. We don't contest those. What they don't get to do is tie the defendant's hands from the outset. So with that, we would ask that the district court's judgment be reversed in the case remanded for a new trial. Thank you. Good morning, your honors. If the court please, Mark Craig on behalf of T.R. Curry. I'd like to on the variance issue. The law is pretty set on what a variance, what's involved in a variance. What I want to key on in this case is the issue of whether they were interdependent. You have five different pharmacies. The success or failure of any of those pharmacies had nothing to do with the success or failure of any of the other pharmacies. They were not in any way interdependent on each other. And as to Mr. Forcurry in particular, what you've got is that he was at Harper, and although he did have an interest in Wayne campus as well as Heartland 1, he didn't have an interest in Eastside, and he didn't have an interest in Heartland 2. In fact, the evidence showed that he didn't even know that Heartland 2 existed. But the fact that he had an interest, a financial interest in either campus Wayne and Heartland 1 doesn't show, there was no evidence that he knew that any fraud was going on there. He never visited those places. He never really had anything. He just made a passive investment in those. So I think it's quite clear there's no interdependence. So the next question, at least in my mind, is the prejudice issue. And I think in this case, it is manifest that there was prejudice. You have Mr. Crazott who testified that at Harper where Mr. Forcurry was the pharmacist in charge, the pick, that he was never told by Mr. Forcurry to commit any fraud. Mr. Abdallah never told him to commit any fraud, and he never committed any fraud. And what I think is really important in this case is that Mr. Forcurry testified and said, I wasn't involved in fraud. If the jury believes that testimony, he's acquitted. So you have all of this other acts coming in of all these other pharmacies that just spills over to Mr. Forcurry. I apologize. I wanted one minute for rebuttal. And then you also look at prejudice. You have, as I said, Mr. Crazott said he never was told to do any fraud, never commit any fraud. You had Jennifer Thomas who testified, and she was a senior manager over pharmacy investigations at CVS Caremark. There was an audit in 2012. She didn't have any concerns. She didn't terminate the contract with Harper based on that. And again, Mr. Forcurry himself testified that he did not commit any fraud. And when a defendant testifies, I think it's a completely different dynamic having tried maybe 75 to 100 cases over my 46 years of doing this. And when a defendant testifies, and you have all this prejudicial information, it just undercuts his testimony. And it becomes so prejudicial. If you look at the cases where they find there's no prejudice, in each of those cases, for example, in Guerro, I think it was, he admitted that he was involved in at least one of the conspiracies. That's not the case here. Mr. Forcurry completely denied that he had any involvement in any fraud. And did he ask for severance? Pardon? I'm sorry. Did he ask for severance of his case and have a separate trial? He did not. He did not. But that doesn't change the legal issue of whether or not there were multiple conspiracies here. And I just don't think it can be argued with a straight face. I don't understand. Where ownership is interdependent, in other words, where they all, like Maude owns all five and Forcurry owns a few, and the government shows evidence that they acted with a common goal, why isn't that not? It's not enough. There is no question that there was a common goal here that the method of the fraud was similar in each case, billing for prescriptions that were not dispensed. But what you don't have in this case is you don't have Mr. Forcurry being involved in any of the fraud at any pharmacy, if you believe the cooperating witnesses other than at Harper. And the testimony of the cooperating witnesses at Harper is undermined by, I think, Mr. Krasath, the CVS, Ms. Jennifer Thomas. Was Forcurry not involved in three of the pharmacies? Am I wrong about that? He was involved. He was only a pharmacist at Harper. I understand that. But did he not have ownership interest? He did, yes. He had ownership interest in Wayne Campus and in Heartland One. And another thing that I think is really important that dovetails with Mr. Goetz's argument about the other act evidence that didn't come in is that there were reversals at some of these pharmacies. Well, if this was a huge scheme to defraud, why would you reverse some and not the others? I think my time is almost up. And if the court has any questions, I'd be happy to answer them. But I think it's very clear, at least in my mind, that there were separate conspiracies here. And the question becomes prejudice. Thank you. Good morning, James Jaramet. On behalf of Ali Abdelrazak, I'd like to reserve one minute for rebuttal, please. Thank you. I want to start off by talking about the Rule 17c denial and what I think was a denial of compulsory process. And this goes, again, somewhat to Mr. Goetz's argument about the Confrontation Clause and the ability of the defendants here to meaningfully challenge the government's evidence against them. And I think at certain points, the government admits that really to challenge the evidence against them, what the defendants need to do, and this is on page 78 and 79 of their brief, is to show either overcounting of billings or undercounting of total purchases. And they say that in response to the argument about legitimate sales at the pharmacy. They say, well, legitimate sales wouldn't matter. What is it that you wanted that you didn't have? What did we want that we didn't have? We wanted the wholesaler invoices for these pharmacies. You didn't have that? That wasn't in the discovery? Well, we got what the government got, yes. But the government is not a gatekeeper to evidence. We're not talking about discovery here. We're talking about evidence that they needed to meaningfully challenge what the government did. Now, if we say, well, the government gave you their copy, what the court's going to say is, look, just trust the government. The government gets to be the gatekeeper. If the government gets it first, you have to rely on the government. Trust them. Why don't you have these records? In other words, you're talking about your own pharmacies, right? Am I missing something? Well, there's a couple issues here. So when you say you're talking about your own pharmacies, and I want to, the court asks, what's the percentage of legitimate here versus overpayment? I think, and this goes a little bit to the variance argument, Mr. Abdel-Razek was involved in one pharmacy here. Wayne Campus? Wayne Campus. So when you say you had your pharmacies, Mr. Abdel-Razek did not have his, these are not his pharmacies. He's involved in one pharmacy. There was joint ownership with other, and there were inter-pharmacy sales. So for Mr. Abdel-Razek to really meaningfully look at all these numbers, he needed the information from all the pharmacies, and he needed to try to figure out who had excess inventory, what sales would have gone to Wayne Campus Pharmacy. I think there's abundant testimony that Mr. Abdel-Razek was- I'm curious, was there a joint defense agreement here? I should know that, Your Honor, and I do not know. I apologize. Additionally, there's evidence- If he would have access to the one pharmacy where he was intimately involved and could spot check if the government gave all of the government's evidence, which presumably included that pharmacy separated out, he could spot check and see if it was correct vis-a-vis that pharmacy, correct? To a certain extent, he could, Your Honor. You've got to remember that there was a seizure of the defendant's records in this case. So if that- I mean, you got copies of them. It's right in discovery. You'd get all your records back. I mean, you might not get the originals, but you get copies. Right, copies of the records would be seized. Correct, Your Honor. Additionally, there's- And you could go- I'm sorry to interrupt you. No, no, no. And you could go inspect them, of course. Correct, Your Honor. Okay. But there is abundant evidence that Mr. Abdel Razek was a terrible record keeper. There's testimony from Mr. Abdel, the cooperating witness, that they were looking for signed scripts because things were a mess at that pharmacy. It's not clear to me that he would have had all these records, that they would have all been kept electronically. And even if he- Very speculative, like you're just throwing stuff out as possible problems here. So if the defendants had all these records, if they were easily available, I don't think they would have asked for this Rule 17c subpoena, Your Honor. 17c, they're not asking for discovery. I mean, this gets called a phishing expedition. This is not a phishing expedition. The government wouldn't got all these records from the wholesalers. If the government's entitled to get all those records, if they're evidentiary for the government, why aren't they evidentiary for the defendants? I mean, that's what it basically comes down to. This is a case where everyone's saying, trust the government. But if they're evidentiary for the government, they should be evidentiary for the defendant. This is really the meaningful way that the defendants could contest the analysis that Ms. Sullivan did, and they weren't allowed to do that. Why do they have to rely on the government? That's what no one, I think, has been able to sufficiently answer. If it's a phishing expedition for the defendants, why wasn't it a phishing expedition for the government? Why couldn't the government just rely on the records that they seized from the defendants? Why did they get to go to the wholesaler? No one's answered that yet. And I think that's the question. Thank you. Thank you. Good morning, Your Honors. Kasim Dakhbala on behalf of Ken Nicholson. This court should vacate my client's sentence and remand for a proper loss calculation, number one. Number two, given the broader trial errors, the conviction itself should be vacated. Now, I'm not going to harp on too many things that have been covered already, and my client relies on all the arguments and all the briefs. But the government's case hinged on the clarent analysis. Yet the district court allowed testimonial hearsay through a substitute expert, as we've covered, violating the Confrontation Clause, restricted cross-examination and prevented meaningful inquiry into the methodology's reliability, and improperly barred exculpatory evidence, including billing reversals and legitimate transactions under a misapplied prior good acts rule. This wasn't a case of prior good acts. There was some discussion earlier about the percentage of transactions that were fraudulent. Well, the government produced witnesses that testified alternatively that maybe 50% of the transactions were fraudulent, maybe 12.5% of the transactions were fraudulent. When the defense is not allowed to put forth the high volume of reversals of transactions, and this was presented during sentencing by me, at least I attempted to present it, those reversals were, for Heartland 1 and Heartland 2, where my client was involved, over half a million dollars of reversals. When you consider that evidence, which the jury wasn't allowed to do, when you consider the high volume of credit card purchases, which contributed to the increase in the inventory, which rebuts the allegation that you had only fraudulent transactions or 50% fraudulent transactions, those are $350,000 of credit card transaction purchases from some of the suppliers. When you have a situation where pharmacy-to-pharmacy transfers are not considered, then you really cut into the 50% or 12.5% theory of the government based upon the Clarence analysis. These errors are not harmless. The Clarence analysis was the central pillar of the prosecution. The defense was prevented from presenting this primary evidence rebutting the fraud. So the result is that the conviction should be vacated. But I also want to talk about the loss calculations. The government's theory was simple. If a drug did not appear in a limited set of wholesaler records, it must not have been purchased. And therefore, any billing was fraudulent. But that methodology is incomplete and unreliable. As I said, the record should have shown for completeness multiple categories of transactions that the government failed to account for. The credit card purchases from additional wholesalers, the pharmacy-to-pharmacy transfers, the starting inventory, and the reversals. As this court has made clear, loss must be based on reliable and specific evidence, not speculation. And that's exactly the problem here. The government filled gaps in its data with assumptions of fraud. Let me ask you this. If we say that there was no error as it relates to Ms. Sullivan's testimony, how does that impact your loss argument or trial testimony? Sure, but by definition, her testimony was erroneous because it failed to consider, and no witness was allowed to testify, on mathematical issues with the conclusion that 50% or 12.5% of the transactions were fraudulent. The question was, if we find no error, then how does it relate to your loss issue? You must necessarily agree that the purported evidence of half a million dollars of reversals at two pharmacies, $350,000 of credit card purchases, and pharmacy-to-pharmacy transfers are not relevant at all. And I'm not seeing how the court could come to the conclusion that that much exculpatory evidence is just not relevant. Would it have changed the guidelines? In my client's case, yes. So at Heartland 1 and Heartland 2, the amount of fraud that my client was attributed to my client was about a million dollars, a little over a million dollars. My client also had Wayne Campus alleged fraud attributed to his loss calculation. Was he a co-owner there? He was a co-owner, but under a case that I've cited and relied upon, United States v. Mahmood, Sixth Circuit case, there has to be reasonable foreseeability. Did he receive profit payments from there? Yes. But there has to be reasonable foreseeability that the instrumentality of the fraud was being used to commit fraud. And in this case, my client being a co-owner is not evidence of that reasonable foreseeability. The government has to put on evidence of reasonable foreseeability under U.S. v. Mahmood, and that was just completely lacking in this case. Being an owner simply doesn't mean that you're responsible for everything that somebody does to commit fraud. I mean, that's directly the holding of U.S. v. Mahmood. My client in that case was Badr Ahmadani. He was a very downstream defendant in a very broad sweeping conspiracy, and he was tried with the ringleader, Mr. Mahmood. And in that case, the district court found that if you're in for an inch, you're in for a mile. So my client, who was a very big player who owned one home health care business among 12 or 13 that were involved in the overall fraud and only did so for a year and a half when the fraud stretched eight years, my client was tagged with the entire conspiratorial loss amount, which was $44 million when the evidence showed... I'm sorry? Your client wasn't tagged with the whole loss amount here. No, but as far as Wayne Campus goes, my client had nothing to do with the operations of Wayne Campus. So the reasonable foreseeability argument that was applicable in U.S. v. Mahmood as to defendant Ahmadani should be applicable here. Sorry, I'm out of time. So if we didn't count the Wayne Campus amount, how much lower would the guideline range be? So if Wayne Campus is deducted, if the reversals are accounted for, if the credit card purchases are accounted for, my client's loss amount becomes less than $250,000, and that would have a meaningful impact on the sentencing guidelines. Thank you. Thank you. May it please the court, Tori Roberts on behalf of the United States. I'd like to use my time today to discuss five issues. First, the confrontation clause issue. Second, the Rule 17 subpoena issue. Third, the legitimate billing issue. Fourth, the question of whether there was a prejudicial variance. Fifth, the question of whether there was a misdemeanor. Sixth, the and fifth, the discussion of the loss amount for gussing sentencing. So first, beginning with the confrontation clause argument with respect to Sullivan's testimony. As I think some of the court's questions indicated during my friend on the other side's argument, the objections that were made during Sullivan's trial testimony were personal knowledge, and that is a Rule 602 objection. It is not a confrontation clause objection. I'd also like to discuss the timing of when the motion for reconsideration was filed. So here, Sullivan's testimony concluded on day four of the trial. On day 12 of the trial, which was the day that the government rested, that was when Abdal-Razik filed his motion for reconsideration, in which he argued for the first time that Sullivan's testimony violated the confrontation clause. In the context of trial testimony, you need to make a contemporaneous objection that puts the court on notice of the constitutional nature of your objection. So I think in reply, defendants cite some cases about the kind of the prudential considerations around issue preservation, and if a district court considers an issue, sometimes this court might not apply plain error review, but those cases weren't in the context of trial testimony, where it's important that a contemporaneous objection is raised so that the court can address it, and we don't then have, you know, additional, I think, 17 more witnesses that testified, and additional over a week of trial testimony before an objection is actually raised with respect to the testimony. Isn't the objection of lack of personal knowledge akin to a confrontation clause objection? I mean, it's not like you're arguing someone's on Mars and instead they're on Earth. Sure, but I think, similarly, a hearsay objection is akin to a confrontation clause objection, and this court, in several cases, has said that a hearsay objection is not sufficient to put the court on notice that you are making a constitutional claim, and I think personal knowledge is a very common evidentiary objection, just as hearsay is. So, I think cases like Hadley, Collins, Powers, all of those indicate that the objection needs to put the court on notice of the constitutional nature of the objection. So, if you're correct, then we would review for plain error, is that right? Yes, that's correct, and so I think, you know, regardless of the standard of review, I think Sullivan's testimony was permissible, but applying the prongs of plain error here. First, I don't think that there even was an error because Sullivan was personally involved in the invoice reviews. This is not a case like Smith, where a substitute expert was added at the last minute who had no prior involvement in the case. What they're saying, at least my understanding of the argument, was there are other individuals that said that the records or the analysis was accurate and complete, and that Sullivan really couldn't do that because other people did those jobs, but she testified that the analysis was accurate and complete. Why is that not testimonial hearsay? Sure, so one, as a kind of preliminary point, the defendant stipulated to the admissibility of the results of the invoice reviews. So, regardless of whether there's other aspects of the testimony that they might take issue with, they stipulated that the actual results were admissible, and here Sullivan said that in December of 2023, when these invoice reviews were conducted, she reviewed all the inputs with a fine-tooth comb. She reviewed the SAS program, made sure the parameters were correct. The parts of the analysis that she discussed that other members of her team did were working with law enforcement to collect records and to evaluate them for completeness. The fact that other individuals were involved in collecting business records and evaluating for them for completeness did not result in a testimonial statement that was conveyed to the jury. What Sullivan said when she was asked on cross-examination, you know, why did you actually review the wholesaler records to make sure there were records for every single month, for example, and she said, well, no, I didn't do that because I understood that other people on my team already had. She wasn't, you know, affirming to the jury, oh, I know that the records are complete because someone told me so. What she was explaining was kind of the limits of what she didn't did and did not do in her role in the analysis, and so I think in going back to the discussion about Melendez-Diaz and footnote one in that decision about the idea that not everyone who puts their hands on a piece of evidence needs to testify, and there the discussion was about chain of custody and that not everyone in the chain of custody needs to testify and that there's gaps in chain of custody that goes to weight, not admissibility. I think similarly here, the defendants were fully entitled to probe on cross-examination the gaps in Sullivan's personal involvement and put that out for the jury to say, you know, she wasn't involved in the collection of the wholesaler records, so she can't tell you that she personally knows that they were complete, and they were fully within the right to do that, and they fully cross-examined her on those points, but that again went to weight, and it was proper questions for cross-examination. It did not go to the admissibility of her testimony. I think going back to the point about Sullivan not being a substitute expert in the way that Smith was, here Sullivan was added as a witness to the witness list at the last minute, yes, but she was personally involved in these reviews that happened eight months before trial. She also was identified in the expert disclosures that were provided multiple years before trial, so even though she was not the witness who was slated to testify, the government had identified her as a clarent witness with similar experience and qualifications and had provided transcripts of her prior testimony to the defendants so that they would understand what a clarent witness's testimony would likely look like. So the defendants certainly were on notice of what this testimony was going to look like and agreed to stipulate to the admissibility of the results of the reviews and did not raise any concerns until she was on the stand at trial. Lastly, I think even if there was any sort of issue here with respect to Sullivan's testimony, it was harmless. So I'd like to run through the additional buckets of evidence that the government presented separate from Sullivan's testimony. This was a 15-day trial. Sullivan's testimony lasted for less than a day and a half of that time. The government presented evidence from three co-conspirators, all of whom testified that they conspired with some or all of the defendants to commit health care fraud. The defendants point out, you know, some of those co-conspirators had baggage, but all three of them provided remarkably similar testimony regarding the nature of the scheme and the tools that they used to carry out this fraud. So one of the things that she, Sullivan, testified to were the amounts that were the result, as I understand it, were the result from the studies that she was reporting on and testifying on. So was there any other evidence about those amounts? There was no other evidence about a specific amount. There were witnesses who testified who gave, there's been some discussion of the estimates that they provided in terms of how much of the billing was fraudulent. Sullivan's testimony and the, but again, separate from her testimony, the actual exhibits, the reports themselves were admitted at the outset of the trial by stipulation separate from Sullivan's testimony. So the confrontation clause is concerned with, you know, admitting out of court statements through a witness who did not make those statements herself. But here, those reports, those actual numbers were admitted by stipulation at the outset of the testimony before Sullivan even took the stand. Separately, as we noted in our brief, even if the loss amount, which the court then used at sentencing was in some way problematic from a confrontation clause perspective, information that's considered at sentencing cannot form the basis of a confrontation clause claim. And there was ample evidence that the defendants conspired to engage in healthcare fraud, even if there wasn't separate evidence of the precise amounts, if you completely disregard clearance analysis. So going back to the harmless error discussion, in addition to the three co-conspirators who testified, the government also presented evidence from multiple pharmacy witnesses who were not part of the conspiracy, but testified that they witnessed some of the defendants engaging in these fraudulent practices. For example, adding signature records to additional prescriptions that the beneficiary didn't sign for, or, you know, telling them to put prescriptions to the side for certain higher-priced medications that the defendants wanted to handle the reversals for themselves. And even if you think the co-conspirators had an incentive to try to, you know, reduce their sentencing exposure, those pharmacy employees were unbiased and were not part of the conspiracy, had no reason to testify about that information unless it was true. Additionally, there were patient beneficiaries who testified that their insurance was billed for medications that they did not receive. For example, there was one beneficiary from Wayne Campus who said that the billing records showing that she received 56 inhalers over a time period from 2015 to 2018 were incorrect because she stopped using inhalers in 2015. There were also text messages of the defendants discussing the fraudulent scheme in which they discussed things like, you know, the risk of hiring outsiders, their potential liability. They joked that no legal business makes 50% profit. They strategized their response to audits. And so that was direct, those text messages were direct evidence of the defendants' involvement in the fraud scheme, separate and apart from Sullivan's testimony. I guess the concern from the defendant's perspective is that Sullivan was here as a disinterested witness, whereas you can say some of these other witnesses, especially the co-conspirators, were very interested. And she's giving the overview evidence as opposed to one patient here saying, well, I really didn't get the inhalers. Obviously, that could be pinpoint evidence to a particular defendant and a particular amount. So how would you deal with that? If we felt that there was a confrontation cause violation here, why wouldn't her evidence be harmful error as opposed to harmless error? I think the overview witnesses were more so the co-conspirators and the defendants' own words and text messages, not Sullivan's testimony. I think Abdallah, for example, he was on the stand for days. He had an ownership interest in all five pharmacies. He talked about his direct communications with the defendants. And so I think that's where you need to look at the evidence as a whole. The defendants point out, oh, he might have had an incentive to try to reduce his exposure. But again, that goes to the point I was making about the fact that there were three co-conspirators, all of whom provided remarkably similar testimony. So the fact that also the defendants received profit-sharing checks, which Abdallah testified would not have been possible without the fraud. So it wasn't just that there was one additional witness who was providing this testimony. It was all of it together. The text messages, the pharmacy employees, the co-conspirators, the profit-sharing checks, all of that provided ample evidence of the defendants' involvement in the fraudulent scheme, separate from Sullivan's testimony. Sullivan's role was primarily just to report on the actual financial analysis of the numbers. But again, she was one of 20 witnesses who testified over a 15-day trial. So there was a significant amount of additional evidence separate from her testimony. Is there a case that you would point us to that would say that testimony such as Sullivan is not in violation of the Confrontation Clause? So I think it's a bit difficult because this is a fairly recent development in the Supreme Court's case law after Smith. And so I think there isn't quite a developed body of case law yet in terms of what a decision like Smith means for a case like this. As the court's questioning, I think, indicated, Smith, Bullcumming, Melendez-Diaz, all of those are about a more discreet report of a specific test of drugs or a blood alcohol sample, for example, where you could pinpoint that it was one analyst who conducted the test. This is different in that we have a whole team that was working on things. And you have an expert who was material involved, supervised the team, but admitted, you know, I was not involved in every single step of the entire process over a multi-year investigation. And I just don't think there's case law that's been developed yet post-Smith that really answers this question. So the question from the defendant's perspective, I think, is how can they challenge this kind of evidence when Sullivan is sort of, I'm going to label her the supervisor, the person pulling it all together, but where they may have challenges as to the wholesaler information or the retailer information or other things that are more below the ultimate conclusion? I think, again, that goes to my point about weight versus admissibility. I think the business records themselves were admissible. If they had issues with gaps in those records, and I'm happy to discuss the wholesaler records and the argument about potential gaps in those records, but they could have pointed out any potential holes or gaps in the record collection or any errors in the calculations. And then again, and Sullivan could have answered that. And then if there were questions that she wasn't able to answer because she wasn't involved in the entirety of the process, that again goes to weight, not admissibility. And the jury was fully informed during cross-examination about those gaps. And the jury was permitted to weigh that in the context of all the evidence and decide whether they viewed Sullivan's testimony to be credible. And here, clearly, they did. You agree that all of these records were put together in anticipation of litigation, correct? Correct. Well, the wholesaler records, excuse me, one correction on that, the Medicare and Medicare claims data, they were extracted for litigation, but the records themselves, then the wholesaler records, similarly, their business records that existed, they were compiled for litigation. I just wanted to make sure that was clear. And when there's discretionary calls made by someone who's not a supervisor, would that subject them to testimony? In other words, is that a way to think about it? Like someone else is making a discretionary call, why shouldn't they be able to test that discretion? I think you have to think about the definition of testimonial hearsay. So one, is there actually a statement that's being conveyed? So the fact that someone exercised discretion somewhere in the process and that carried through to the final result, that doesn't mean that there's a statement being conveyed on behalf of that analyst. And two, is it testimonial? So here, a decision of which wholesalers- Let me give you an example, and maybe I'm just, I'm thinking out loud, so it's dangerous, but let's assume there were $350,000 where they actually issued refunds or whatever. And the person who's pulling it made a determination that those $350,000 don't matter and don't need to be included. She presumably, how can they test that? I'm struggling a bit with the hypothetical because it's not an accurate description of the way the analysis works. So I just want to make sure I am clear on that, that the records themselves, it's built into the records whether something was reversed or not. So it's claims counted or didn't count. They pulled all of the claims. If there was a reversal, it wouldn't be a final paid claim, so it would not be in that claims data. So I guess the response to the defendant's later argument is all that was included. Correct. Yes. But how can they test that? So they have all of the data. They have the claims data, they have the wholesaler data, they have- Correct me if I'm wrong. They had the data that you all gave them, right? Because they were denied the right to subpoena the records and get them from the wholesalers themselves. They had the records that the government gave them. I'm happy to discuss the Rule 17 issue, but in terms of them testing the actual analysis that was done, they had all the inputs. They had the wholesaler records that the government gave to Clarent and that Clarent then used in their analysis. So if there's an issue with the analysis, they have all the inputs and they can evaluate that themselves. With respect to the wholesaler records, I'm happy. I don't want to move on to this unless there's any further questions. They have all of what the government said were the inputs. Yes. And they can test the analysis that the government applies to come to the conclusion. So then the question is, can they test what the inputs are? And that's where you get to the 17C subpoena. Yes, that's right. And so why shouldn't, I guess I am taking that question, why shouldn't they have been able to get the wholesaler records themselves from the wholesalers so that they could see whether the government's numbers and criteria on who are the wholesalers and how much did the wholesalers sell to them match up with what they think is the proper situation? So this court and the Supreme Court have both said that Rule 17 is not meant to provide a means of criminal discovery. So Rule 16 is the discovery. Rule 17 is about making material available prior to trial. And there's specific requirements that need to be met in order for a Rule 17 subpoena to be appropriate. And one of the main issues here, which the district court recognized, is that the defendants didn't make a specific request. They didn't say, you know, we reviewed the wholesaler records and we think records are missing from these specific three wholesalers, can we get those records? Instead, they made a broad request for records across a 10-year period from 44 different wholesalers for all five pharmacies, including many that were duplicative of wholesalers that the government had already obtained records from and produced in discovery. So theoretically then, the government got these records from all of the wholesalers. I'm making this number up and I thought it was 40 or something, 40 wholesalers. Why shouldn't the defendants be able to get independently the same records? If the wholesalers have produced these records to the government, presumably it's not going to be that much of a burden for the wholesalers to produce them to the defendants. So the defendants already had it. The defendants had exactly the same records that had been produced to the government, but then the government produced in discovery. I will make one bit of a correction in terms of if it wasn't all of the same records. The government had obtained records from certain wholesalers based on from a review of the financial records at the pharmacies. So law enforcement reviewed bank statement, credit card statements, things like that, and PBM application information to identify the relevant wholesalers that each pharmacy purchased their drugs from, and then subpoenaed those wholesalers. So it wasn't the case that the government had obtained all these records from 44 different wholesalers. They had done a little bit more of a tailored approach pharmacy by pharmacy. And so here the defendants didn't say, oh, for this specific pharmacy, we know we purchased from X wholesaler that you didn't obtain records from. Instead, they just tried to do a broad swath request to check the government's work. And in terms of the why question, that's just not the function of Rule 17, and both the Supreme Court and this court have said that. So I think even if there's any sort of fairness concern about if that's the way that the rules should work, it just is the way that the rules operate. And here the defendants haven't pointed to any specific wholesaler records that were missing or that they weren't able to obtain. Even in their Rule 17 motion, they discussed the fact that when they had pointed out a few additional records that they needed, that the government had obtained those for them. The government's position was just that this really broad request from 44 different wholesalers for a 10-year period wasn't an appropriate use of Rule 17. And you mentioned the Supreme Court and Sixth Circuit cases. Are there particular ones you would point us to? Yeah. So I think for this circuit's case, Lenez-Garcia, which is in our briefs, that's at 735 F3, 483. And then in terms of the Supreme Court case, I apologize, I don't think I have that. So in Nixon, there was a discussion of it. And I think Nixon also referenced a prior case, apologies, I don't recall the name of it off the top of my head, but discussed the function of Rule 17 in conjunction with Rule 16. And both of those cases reference the idea that Rule 17 isn't intended to provide a broad swath of criminal discovery. If there are no further questions on that, I'd move on to the legitimate billing issue. So I think here, I wanted to just benchmark at the beginning, the defendants here are raising a constitutional claim. They're not asking this court to even separately decide whether the court abused its discretion in applying Rule 403 and Rule 404. So it's a very heavy burden for the court, for the defendants to establish that in applying this rule, the district court's decision was so arbitrary and outside the bounds that it amounted to a constitutional violation. We cite several cases in our brief regarding the rule that a defendant cannot put on evidence of prior good acts to seek to rebut evidence of fraud. I think the 11th Circuit's case in Ifebita is really instructive on this point. There, a defendant was similarly charged with conspiracy to commit healthcare fraud and attempted to put in evidence of some examples of legitimate treatment of patients. And the 11th Circuit said that that wasn't appropriate because the government never contended that the entire business of this individual was fraudulent. It was just that certain treatment was. Similarly here, the government's theory of the case at trial was that the defendant certainly engaged in a significant amount of legitimate pharmacy operations. The issue was just that they also engaged in illegitimate practices. And so it would have risked confusing the jury by putting in ad hoc examples of legitimate billing when that wouldn't have rebut the idea that they also engaged in these illegitimate practices. I think in any event, this exclusion of this evidence was not of constitutional significance. In order to show that it was of constitutional significance, the defendants would need to show that it would create a reasonable doubt that otherwise didn't exist. And here, as we outlined in our brief, there was a significant amount of evidence presented at trial showing that the pharmacists did dispense medication, that patients picked up medicine, that they occasionally processed reversals. And so additional examples of legitimate billing would not have rebut all the additional evidence I outlined at the beginning, including the testimony from the three co-conspirators regarding the fraud scheme. If there are no further questions on that, I'd like to move on to the prejudicial variance issue. So I think the chart we have at the beginning of our brief mapping out the ownership interests of the pharmacies really goes a long way to showing why this was all one conspiracy. You have defendants with overlapping interests in the different pharmacies. They were all pursuing the common goal of increasing the profits of the pharmacies and thereby increasing their profit-sharing checks by engaging in this fraudulent scheme. The defendants also used very similar tools across the different pharmacies to carry out the scheme. For example, their efforts to falsify signature logs to cover up the fact that they were billing for prescriptions that they had not dispensed. And it's not necessary for each defendant to have an ownership interest in all five pharmacies in order for there to be one conspiracy. Mr. Ficuri was the one who's specifically raising this point and saying that he was involved only in the one pharmacy. How do you respond vis-a-vis him in particular? Sure. So both Ficuri and Abdul Razak are raising this. Ficuri was involved in three pharmacies in terms of his ownership interest. He was the pharmacist in charge for one, but he also had Razak as the one who only was involved in one of the pharmacies. But again, I think even if a conspiracy can be subdivided, it does not mean that there can't be one conspiracy. I think here, Abdul Razak was in communication with his business partners. He understood the scheme based on, you know, Abdallah said that he had a conversation with him at the beginning of their business partnership where he told him, you know, this is the practice that I engage in at Eastside, for example. And then he kind of coached him on how to implement that at Wayne campus. And so I think the fact that Abdul Razak, even if he was only involved in one of the pharmacies, was generally aware that his business partners were pursuing this strategy and scheme across multiple pharmacies was sufficient for there to be a single conspiracy. He knew that his business partners were carrying this out at multiple pharmacies. They coordinated regarding the tactics that they use and their response to audits, for example. And so that level of kind of interdependence among the business partners was sufficient for the jury to find that there was one conspiracy. And again, you know, this is a jury finding. And I think here where the district court provided this court's pattern jury instructions on multiple conspiracies, the court should defer to the jury's finding that there was one conspiracy here. And I don't think the defendants have met their burden of showing that it's only possible to view the evidence here as presenting multiple conspiracies and that it was, you know, entirely outside the bounds for the district court to, excuse me, for the jury to have found the one conspiracy here. Was there an objection to the jury instruction? No. So what happened was that the defendants first raised this in their Rule 29 motion. And in response to that, the district court denied the Rule 29 motion but decided to give the jury instruction on multiple conspiracies, and there was no objection to that instruction. And then quickly just on prejudice, even if there was a variance here, there certainly was not prejudice. In the cases where this court and the Supreme Court has found prejudice for a variance when there's multiple conspiracies, it's a case where there's, you know, several defendants, numerous possible conspiracies, or if their conspiracies are of a different nature. Here we had four defendants, at most five separate conspiracies, all of a similar nature. And I think I would make one correction. You know, Foucuri's counsel said he, at trial, didn't dispute, excuse me, at trial disputed that he committed any fraud. But in his brief on appeal, he acknowledged that there was sufficient evidence that he was a member of a conspiracy to commit fraud at Harper Drugs. And so certainly he's conceded that there was evidence that he, you know, was part of at least one of the conspiracies, even assuming that there was multiple. So I think he just has not shown that even if there was a variance, it caused prejudice. Lastly, if there's no further questions on that, I'll turn to the sentencing and loss amount discussion. So at the outset, I'd like to note for Guson's sentencing, the district court gave him the opportunity to submit supplemental briefing on the loss amount, and he did not do so. So the claims he's raising now regarding the quantity of the reversals, the quantity of the credit card purchases, the district court said during the sentencing hearing, you know, you haven't given me information to back up these claims that you're making. So if you want to submit supplemental briefing, I'll consider it. And Guson never did so. So I think this court should either view that claim as waived or review it for plain error because he made that objection but then abandoned it. But the burden is on the government to show the amount of loss, right? At the district court, yes, the burden was on the government to show it by a preponderance of the evidence. And so the district court found, relying on Clarence analysis, that for Guson's sentencing, the government had met its burden to establish the loss amount, which was about $3.3 million. Again, in order for it to affect the guidelines range here, the loss amount would need to be less than $1.5 million. And I think when you view the kind of factual corrections we note in our brief regarding some of the claims he's making about the deductions, he just can't get below that $1.5 million threshold, even if you assume that there's some minor errors in the analysis. Wayne Campus, for example, he points out whether the loss from Wayne Campus was foreseeable to him. The loss from Wayne Campus was approximately $600,000. So even if you removed that from his loss amount, it would not be significant enough to affect the guidelines range. If there are no further questions, the government would ask this court to affirm the defendant's judgment of conviction. Thank you. Thank you. Three points in rebuttal. First, the government referred to the ability to cross-examine Sullivan about somebody else's statement as a reason why there may not have been a confrontation clause violation here. That's not correct. Your ability to confront one witness about another witness's statement does not satisfy confrontation. Even in the expert category that we have here, this was part of the dissent's reasoning in Melinda Zia's, Bull, Cumming, and Smith that you could cross-examine the expert about limitations of knowledge. That position did not get a majority on the Supreme Court. So that's point one. Point two, Judge Moore, in answer to your question about other cases that have considered this issue post-Smith, I'd refer the court to the Fourth Circuit's decision in Stewards, just cited in our brief. In that case, similar to here, you had an analyst stand up and testify about what the lab did collectively while incorporating other witnesses' testimonial hearsay. No? But that case, correct me if I'm wrong, I think they said that there was a confrontation clause violation, but that it was harmless error. That's correct, Your Honor, which brings me to the third point, is that this case, unlike Seward, the error was not harmless. And I'd push back on a couple of points the government made. The pharmacy technician, other pharmacist's testimony was not nearly as one-sided as the government states. I mean, in the defense case here, we had at least one, maybe two pharmacy technicians who testified in direct contradiction to the government's case. In addition, the beneficiary testimony was also not nearly as one-sided as the government now says in support of harmless error. I mean, they lost on a number of substantive counts because that testimony did not support their theory in the way they thought it would. So unless there are any further questions, we would ask the judgment be vacated and the case remanded for a new trial. Thank you. Thank you. Only one minute, so I'll try to be very quick. I want to talk about the prejudice issue that opposing counsel talked about, that there was a concession that was sufficient evidence that to establish Mr. Frickery's guilt. There's no question that the jury believes Abdallah, yes. But the fact of the matter is they may not have believed Abdallah if all of this other extraneous other conspiracy evidence had come in. Again, I can't overemphasize how important was that Mr. Frickery got up and said, I was not a participant in any fraud. I also would like to just for, I'm going to talk about the ownership, which Judge Lepar brought up. The fact that he had an ownership interest is not the same as knowing that there was fraud occurring at that pharmacy. There is no evidence whatsoever on this record that Mr. Frickery knew that fraud was being committed. Thank you. I'll be very brief. Talking about the preservation of the Confrontation Clause issue, I would just point the court to ECF 280, which is the government's response to Mr. Abdel-Razak's motion to reconsider in that they don't claim that the objection at wasn't sufficient to raise the Confrontation Clause issue. They treat it as if it is preserved in that motion to reconsider. They quite clearly say nothing new has been raised here. It's the same argument as before. I think that's telling that the objection, the contemporaneous objection was sufficient enough to raise the Confrontation Clause issue. Thank you. Briefly on the issue of the loss amount and whether there was a waiver to challenge that loss amount at sentencing. That's absolutely not true. The reversals were presented in the sentencing brief that I submitted on behalf of my client. We had oral argument on that, including the reversals and what the data would have shown as it relates to calculating the loss. Same thing on the credit card purchases, 350,000 credit card purchases. The court invited further briefing on the issue, but by that point, there was nothing more to present on behalf of the defendant than what was already presented, in large part because of the fact that during the course of the trial, the defendants were barred from obtaining the raw materials through subpoena that would have been potentially utilized for that purpose. So I want to make clear there was no waiver of a challenge on the loss amount at sentencing. Thank you. Thank you all for your argument in this case. The case will be permitted.